# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-2263

_____

Iowa Migrant Movement for Justice; Jane Doe; Elizabeth Roe

*Plaintiffs - Appellees*

v.

Brenna Bird, in her official capacity as Attorney General of Iowa

*Defendant - Appellant*

Kimberly Graham; Zach Herrmann

*Defendant*s

------------------------------

Immigration Reform Law Institute; State of Oklahoma; State of Florida; State of Alabama; State of Alaska; State of Arkansas; State of Georgia; State of Idaho; State of Indiana; State of Kansas; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Virginia; State of West Virginia; Arizona Legislature

*Amici on Behalf of Appellant(s)*

ASISTA Immigration Assistance; American Immigration Lawyers Association; Asian Pacific Institute on Gender-Based Violence; Esperanza United; Tahirih Justice Center

*Amici on Behalf of Appellee(s)*

_____

Appeal from United States District Court
for the Southern District of Iowa - Central

––––––––––––

Submitted: August 28, 2025
Filed: October 23, 2025

––––––––––––

Before BENTON, ARNOLD, and KOBES, Circuit Judges.

––––––––––––

BENTON, Circuit Judge.

Iowa, in Senate File 2340, criminalized the presence within its boundaries of aliens who illegally reentered the United States. Aliens violating this Act are ordered to return to the country they reentered from. The Act forbids judges from abating a state prosecution due to a pending (or possible) federal determination of the alien's immigration status. Iowa Migrant Movement for Justice and two aliens residing in Iowa sued to enjoin enforcement of the Act. The district court[1] granted a preliminary injunction. Iowa Attorney General Brenna Bird appeals. Having jurisdiction under 28 U.S.C. § 1292(a)(1), this court affirms.

## I.

In section 2 of the Act, Iowa forbids a "person who is an alien" to enter, attempt to enter, or at any time be found within the state "under any of the following circumstances": having been "denied admission to or . . . excluded, deported, or removed from the United States"; or having "departed from the United State while an order of exclusion, deportation, or removal is outstanding." **Iowa Code § 718C.2(1)(a), (b)**. *See* **§ 718.1(1)** (section 1, defining "alien" by reference to federal immigration law). Violation is at least an "aggravated misdemeanor." **§ 718C.2(2)**.

––––––––––––

[1]The Honorable Stephen H. Locher, United States District Judge for the Southern District of Iowa.

-2-

If an alien is convicted of violating section 2, then section 4 of the Act provides that a judge "shall enter in the judgment in the case an order requiring the person to return to the foreign nation from which the person entered or attempted to enter." **§ 718C.4(4)**. Regardless, during an alien's prosecution under the Act, a judge may order return rather than continuing with the prosecution *if* the alien consents and other provisions are satisfied (i.e., the alien has not previously been convicted or ordered to return under the Act, the alien is not charged with another offense punishable as at least an aggravated misdemeanor, and the arresting officer has collected all available identifying information and cross-referenced it with relevant databases to determine if the alien poses a threat to national security). **§ 718C.4(3)**. The order to return must include the manner of transportation to "a port of entry" and the "law enforcement officer or state agency responsible for monitoring compliance with the order." **§ 718C.4(5)**.

Section 5 of the Act creates a separate offense for failure to comply with the return order. **§ 718C.5**. Section 6 of the Act provides that a court "may not abate the prosecution of an offense under this chapter on the basis that a federal determination regarding the immigration status of the person is pending or will be initiated." **§ 718C.6**.

## II.

Jane Doe and Elizabeth Roe, two aliens residing in Iowa, claim to be harmed by the Act. Iowa Migrant Movement for Justice (Iowa MMJ), a membership-based organization, provides legal services and advocates about immigration issues. Its members include Doe and Roe, as well as about 350 dues-paying members and 2,000 non-dues-paying members who are clients or from immigrant communities. Iowa MMJ identifies two specific members, Anna and David. Doe, Roe, and Iowa MMJ sued Iowa Attorney General Brenna Bird, Polk County Attorney Kimberly Graham, and Clayton County Attorney Zach Herrmann. Doe, Roe, and Iowa MMJ challenged the Act on its face, alleging that it violated the Supremacy Clause of the United

Appellate Case: 24-2263    Page: 3    Date Filed: 10/23/2025 Entry ID: 5570706

States Constitution.  They moved for a preliminary injunction against enforcing the Act.

The district court ruled that Doe, Roe, David, and Iowa MMJ had standing to sue to enjoin the Act.  Considering the *Dataphase* factors, the court found that they "established a likelihood of success on the merits of their position that federal immigration law preempts Senate File 2340 under both conflict and field preemption." ***United States v. Iowa***, 737 F.Supp.3d 725, 751 (S.D. Iowa 2024).  The court also found irreparable harm if the Act went into effect, adding that the balance of the equities and the public interest favored an injunction.  ***Id.*** at 749–50.  *See generally* ***Dataphase Systems, Inc. v. C L Systems, Inc.***, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).  The district court granted the preliminary injunction.  Bird appeals.

This court reviews decisions on preliminary injunctions for abuse of discretion, reviewing factual findings for clear error and legal conclusions de novo.  ***Sleep No. Corp. v. Young***., 33 F.4th 1012, 1016 (8th Cir. 2022).  A district court "by definition abuses its discretion when it makes an error of law." ***Koon v. United States***, 518 U.S. 81, 100 (1996).

## III.

A federal court must first decide whether plaintiffs have standing.  ***Animal Legal Defense Fund v. Reynolds***, 89 F.4th 1071, 1076 (8th Cir. 2024).  This court reviews de novo whether a party has standing.  ***Dakotans for Health v. Noem***, 52 F.4th 381, 385 (8th Cir. 2022).  Plaintiffs have the burden to establish standing.  ***Animal Legal Defense Fund***, 89 F.4th at 1077.  To have standing, a plaintiff must show it suffered an injury in fact, fairly traceable to the defendant, and likely redressable by a favorable decision of the court.  ***Spokeo, Inc. v. Robins***, 578 U.S. 330, 338 (2016).  Only one plaintiff needs standing for a case to proceed.  ***Biden v. Nebraska***, 600 U.S. 477, 489 (2023).  A plaintiff must support each element "with the manner and degree of evidence required at the successive stages of litigation." ***Murthy v. Missouri***, 603 U.S. 43, 58 (2024).  "At the preliminary injunction stage,

-4-

then, a plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Id*. At the preliminary injunction stage, this court assumes the plaintiff's allegations are true and views them most favorably to the plaintiff. *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 667 (8th Cir. 2024).

A.

"Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements. So in those cases, standing is usually easy to establish." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 382 (2024). Also, "allegation of future injury may suffice" to show an injury-in-fact "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *L.H. v. Independence Sch. Dist.*, 111 F.4th 886, 893 (8th Cir. 2024). Both Jane Doe and Elizabeth Roe reside in Iowa. In 2005, Jane Doe was denied admission to the United States and issued a removal order. Later, her removal order was waived and she obtained lawful permanent resident status, reentering the United States. Elizabeth Roe was deported in 2017. Later, her prior removal order was waived and she reentered the United States as a lawful permanent resident. If subject to the Act, they each face a fine of at least $855.00 or up to two years in prison, or both, and being ordered to return to the country from which they entered the United States. **§§ 718C.2(2)**, **903.1(2)**, **718C.4(4)**. An "injury in fact exists when the plaintiffs allege 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder.'" *Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 778 (8th Cir. 2019). Here, Doe and Roe intend to remain in Iowa. This conduct is "arguably affected with a constitutional interest" because the Act criminalizing their presence in Iowa is arguably preempted by federal law, under the Supremacy Clause. *Cf. Id.* (holding that plaintiffs suffered an injury in fact because they intended to engage in conduct that was prohibited by a state statute that was arguably unconstitutional under the Commerce Clause).

-5-

Bird argues the Act does not apply to Doe and Roe, so they "do not face a credible threat of prosecution." *See Zanders v. Swanson*, 573 F.3d 591, 594 (8th Cir. 2009) (holding that plaintiffs lacked standing because their speech that plaintiffs claimed was chilled was not the target of the statute). According to Bird, an alien who reenters the United States with federal permission does not reenter "under . . . the . . . circumstances" of having "been denied admission to . . . or excluded, deported, or removed from the United States" or having "departed from the United States while an order of exclusion, deportation, or removal is outstanding." **§ 718C.2(1)**. Because "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs," Bird concludes that Doe and Roe lack standing. *281 Care Committee v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011).

Bird argues that her interpretation is the natural reading of section 2 of the Act and is required by Iowa's canons of construction. Under Iowa law: "In enacting a statute, it is presumed that," "1. Compliance with the Constitutions of the state and of the United States is intended"; "2. The entire statute is intended to be effective"; and "3. A just and reasonable result is intended." **Iowa Code § 4.4**. Interpreting state laws, this court "follows the state court's interpretation, or if unavailable, uses that state court's rules of construction." *Metropolitan Omaha Prop. Owners Ass'n, Inc. v. City of Omaha*, 991 F.3d 880, 884 (8th Cir. 2021). Bird stresses the Iowa Supreme Court doctrine: "If the law is reasonably open to two constructions, one that renders it unconstitutional and one that does not, the court must adopt the interpretation that upholds the law's constitutionality." *State v. Abrahamson*, 696 N.W.2d 589, 593 (Iowa 2005). *See Star Equip., Ltd. v. Iowa Dep't of Transp.*, 843 N.W.2d 446, 457 (Iowa 2014) (reiterating that "statutes are cloaked with a presumption of constitutionality"). Bird acknowledges that if the Act applied to aliens lawfully in the United States, then it would conflict with federal law and be unconstitutional. Thus, she concludes that the Act must be read not to apply to Doe and Roe, who are both lawfully in the United States.

-6-

Bird also reads section 6 of the Act to require abatement of any inadvertent prosecution of Doe and Roe.  Applying the *expressio unius est exclusio alterius* canon of statutory interpretation, *Kucera v. Baldazo*, 745 N.W.2d 481, 487 (Iowa 2008) (describing that "the express mention of one thing implies the exclusion of others not so mentioned"), she reads the prohibition against courts abating prosecutions "on the basis that a federal determination regarding the immigration status of the person is pending or will be initiated" to *require* abatement after federal officials make a final determination of an alien's status.  **Iowa Code § 718C.6**.

Bird asks this court to ignore the plain meaning of the Act.  *See* **State v. Doe**, 903 N.W.2d 347, 351 (Iowa 2017) (providing that the Iowa Supreme Court first considers the "plain meaning of the relevant language of a statute, read in the context of the entire statute," then applies other tools of statutory interpretation only if there is ambiguity).  True, section 2's phrase "under . . . the . . . circumstances" includes "in this specific situation."  *Under the circumstances*, Merriam-Webster, https://www.merriam-webster.com/dictionary/under%20the%20circumstances (last visited Aug. 13, 2025).  But that does not mean that the Act contains the same exemptions as federal law.  The plain text of section 2 has no exceptions.  Likewise, the plain text of section 6 has no required abatement provision.  It is "at least 'arguable' at this stage of the litigation" that the Act applies to Doe and Roe.  *See* **Turtle Island Foods, SPC v. Thompson**, 992 F.3d 694, 700 (8th Cir. 2021).

Bird cites *L.H. v. Independence School District*, 111 F.4th 886 (2024).  There, this court held that parents lacked standing to sue to enjoin a school district policy that automatically removed a book from the school library after someone challenged the book.  **L.H.**, 111 F.4th at 895.  But there, the enforcement of the policy required the acts of third parties—someone challenging books—and the parents did not allege that "any challenge is currently pending or that any such challenge has been threatened" by a potential challenger.  **Id.** at 894.  Here, by contrast, Bird seeks to enforce the Act.  Yes, Bird defends an interpretation of the Act that would not cover Doe and Roe.  But just because Bird has "no 'present plan'" to enforce the Act against Doe or Roe does not mean that she would not enforce it against them in the

-7-

future. *See **United Food & Commercial Workers Intern. Union, AFL-CIO, CLC v. IBP, Inc.***, 857 F.2d 422, 429 (8th Cir. 1988) ("no 'present plan'"). One reason that Bird asks this court to allow the Act to go into effect is so Iowa courts can interpret it. Thus, Iowa courts could reject her reading of the Act. *Cf. **Id.*** at 429–30 (holding that plaintiffs had standing when "the state's position could well change" and the "provisions by their terms apply directly to plaintiffs' . . . activity"). There is still likely a "substantial risk" that Doe and Roe will be prosecuted under the Act. *See **L.H.***, 111 F.4th at 893. Doe and Roe likely suffer an injury in fact.

The injury in fact here is likely fairly traceable to the defendants. Both Attorney General Bird and the county attorneys may enforce the Act. *See **Iowa Code § 13.2(1)(b)*** (authorizing the attorney general to prosecute "all actions . . . in which the state may be a party or interested"); **§ 331.756.1** (providing that the county attorney shall "enforce or cause to be enforced in the county, state laws"). Bird argues that plaintiffs lack standing to challenge section 4 of the Act, because orders of removal are entered by judges, not the Attorney General or county attorneys. But entry of an order of removal is required after a successful conviction under section 2 of the Act. **§ 718C.4(4)**. The injury that plaintiffs face from section 4 does not rest on "speculation about the decisions of independent actors." *See **Clapper v. Amnesty Int'l USA***, 568 U.S. 398, 414 (2013). A judge entering an order of removal is a "predictable effect" of a prosecutor enforcing the Act. *See **Department of Commerce v. New York***, 588 U.S. 752, 768 (2019). The injury to plaintiffs under section 4 is fairly traceable to the prosecutors.

The injury is likely redressable by a favorable judicial decision, specifically, an injunction preventing the prosecutors from enforcing the Act against the Iowa MMJ members. ***FDA***, 602 U.S. at 381 ("If a defendant's action causes an injury, enjoining the action . . . will typically redress that injury."). Bird argues that the injury is not redressable because prosecutors who are not parties to this case (in less populous counties) could still enforce the Act. But a remedy need not completely redress an injury in order to satisfy the requirement for standing. ***Massachusetts v.***

-8-

*EPA*, 549 U.S. 497, 525–26 (2007).  Enjoining some Iowa prosecutors reduces the threat of prosecution under the Act, likely redressing the injury.

Doe and Roe meet their burdens of clearly showing they are likely to establish an injury in fact, fairly traceable to defendants, and redressable by a favorable decision of the court.  They have standing.

## B.

Even accepting Bird's interpretation of the Act, this suit may still proceed because Iowa MMJ has "representational" standing on behalf of members who live in Iowa and are not in the United States lawfully.  An organization has representational standing if it can demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit." ***Students for Fair Admissions, Inc. v. President and Fellows of Harvard College***, 600 U.S. 181, 199 (2023).  Here, Iowa MMJ satisfies all three requirements.

First, Iowa MMJ's membership includes Doe, Roe, Anna, and David.  Anna received an order of removal, left the United States, reentered, received asylum status, now resides in Iowa, and recently graduated high school.  David was deported and reentered unlawfully.  The district court found that he resides in Iowa and is in the United States unlawfully.  ***Iowa***, 737 F.Supp.3d at 745–46.  Under the Act's plain meaning, all four Iowa MMJ members could be prosecuted.  But even if the Act included exceptions for aliens with lawful federal status, the Act still applies to David.  ***Id.***

Bird argues that Iowa MMJ failed to plead that David lives in Iowa and that he is in the United States unlawfully.  *See **Ashcroft v. Iqbal***, 556 U.S. 662, 678 (2009) (holding that a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do'" and that a complaint will

-9-

not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement'"), *quoting **Bell Atlantic Corp. v. Twombly***, 550 U.S. 544, 555, 557 (2009). But Iowa MMJ did plead specific facts: David graduated from high school in Iowa in 2007; he is an Iowa MMJ member; and that under the Act he "could be arrested, prosecuted, imprisoned, and removed." The facts alleged by Iowa MMJ allowed the district court to "draw the reasonable inference" that David lives in Iowa and is in the United States unlawfully. ***Ashcroft***, 556 U.S. at 678. Although this court reviews standing decisions at the preliminary injunction stage de novo, this court must "accept as true all material allegations of the complaint, and . . . construe the complaint in favor of" the plaintiff. ***Heartland Acad. Community Church v. Waddle***, 335 F.3d 684, 689 (8th Cir. 2003); *see also **GLBT Youth in Iowa***, 114 F.4th at 667 ("When considering standing at the preliminary injunction stage, we assume the complaint's allegations are true and view them in the light most favorable to the plaintiffs."). Based on the facts alleged, viewed most favorably to Iowa MMJ, David likely has standing to sue in his own right.

Second, the interests Iowa MMJ seeks to protect are germane to its purposes as a membership organization. Bird argues that protecting aliens like David from prosecution under the Act is not germane to Iowa MMJ's purposes. But Iowa MMJ provides legal services to help "immigrants and refugees . . . avoid the separation from family and community . . . that results from removal from the United States." It also advocates for policies that "protect their foundational rights and allow them to integrate into society in Iowa." Enjoining the enforcement of the Act—which requires removal from the State of Iowa upon conviction—is germane to these purposes. Bird also highlights that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." ***FDA***, 602 U.S. at 394. But that case was about an organization suing on behalf of harms to itself, not to its members. Here, Iowa MMJ members do suffer an injury in fact. Finally, Bird argues that Iowa MMJ may be acting unlawfully if it is helping David violate federal immigration law. *See **United States v. Hansen***, 599 U.S. 762, 766 (2023) (upholding a federal law prohibiting encouraging or inducing

-10-

illegal immigration). But Iowa MMJ is not suing here to help its members violate federal immigration law. Rather, Iowa MMJ brings this suit to enjoin a *state* immigration law that it argues is unconstitutional. The injury suffered by Iowa MMJ's members is likely germane to Iowa MMJ's purposes. *See **ACLU Neb. Found. v. City of Plattsmouth***, 419 F.3d 772, 775 (8th Cir. 2005) (en banc) (holding that the ACLU has standing, and "adopting the reasoning of the panel opinion on this point"), *which was* 358 F.3d 1020, 1031 (8th Cir. 2004) (holding that the ACLU had organizational standing to sue on behalf of its member who was injured by a public Ten Commandments display, because the "interests at stake are germane to the ACLU's purpose of defending citizens' constitutional rights").

Third, this case does not require the participation of Iowa MMJ's individual members. Iowa MMJ facially challenges the Act. This is not a claim that requires "individualized proof." *See **Kuehl v. Sellner***, 887 F.3d 845, 851 (8th Cir. 2018), *quoting **Hunt v. Wash. State Apple Advertising Com'n***, 432 U.S. 333, 344 (1977). Iowa MMJ seeks a preliminary injunction, a remedy that does not require individual participation. ***Warth v. Seldin****,* 422 U.S. 490, 515 (1975) ("If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured."); *see also **Worth v. Jacobson***, 108 F.4th 677, 686 (8th Cir. 2024). Iowa MMJ satisfies the requirements for representational standing on behalf of its members.

## IV.

Evaluating a request for a preliminary injunction, a court must consider: 1. "the threat of irreparable harm to the movant"; 2. "the state of the balance between this harm and the injury that granting the injunction will inflict on the other parties litigant"; 3. "the probability that movant will succeed on the merits"; and 4. "the public interest." ***Dataphase***, 640 F.2d at 113. Probability of success on the merits is the "most significant" factor. ***Carson v. Simon***, 978 F.3d 1051, 1059 (8th Cir. 2020) (per curiam). For a preliminary injunction of an enacted state statute, the

-11-

moving party must clearly show that it is "likely" to prevail on the merits. *Planned Parenthood, Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc). *See also Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024).

A.

Bird argues that Doe, Roe, and Iowa MMJ cannot succeed on the merits because they lack a cause of action for a violation of the Supremacy Clause. True, the Supremacy Clause does not have an implied cause of action. *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 325 (2015). But "in a proper case, relief may be given in a court of equity . . . to prevent an injurious act by a public officer." *Id.* at 327. Bird emphasizes that equitable causes of action must be "grounded in traditional equity practice." *Whole Women's Health v. Jackson*, 595 U.S. 30, 39 (2021). But there is an "equitable tradition of suits to enjoin unconstitutional actions by state actors." *Missouri*, 114 F.4th at 986, *citing Armstrong*, 575 U.S. at 326–27. The Supreme Court has "long recognized" that "if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Id.* at 326. Bird acknowledges this equitable tradition, but argues that Doe and Roe do not have an equitable action here because they are not "about to" be subject to prosecution under the Act. *Ex parte Young*, 209 U.S. 123, 156–57 (1908). But, as discussed, the plain meaning of the Act criminalizes Doe and Roe's presence in Iowa. Doe and Roe likely have an equitable cause of action. *See Florida Immigr. Coal. v. Attorney General*, 2025 WL 1625385, at *3 (11th Cir. June 6, 2025) (allowing a preliminary injunction of a similar Florida law challenged by an *Ex parte Young* cause of action).

Bird also argues that Iowa MMJ lacks an equitable cause of action because it, as an organization, is not subject to prosecution under the Act. True, whether a cause of action exists is a different question from whether a plaintiff has standing. *Davis v. Passman*, 442 U.S. 228, 238 n.18 (1979) ("Whether a petitioner has asserted a cause of action . . . depends not on the quality or extent of her injury, but on whether the class of litigants of which petitioner is a member may use the courts to enforce

-12-

the right at issue.").  But the Supreme Court has stated that "there is no warrant in our cases for making the validity of an *Ex parte Young* action turn on the identity of the plaintiff."  ***Virginia Office for Protection and Advocacy v. Stewart***, 563 U.S. 247, 256 (2011).  An *Ex parte Young* action requires "a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."  ***Id.*** at 255.  Iowa MMJ's complaint does so.  A plaintiff with representation standing may bring an *Ex parte Young* action.  *See, e.g.*, ***Pharmaceutical Rsch. & Mfrs. of Am. v. Williams***, 64 F.4th 932, 936, 948 (8th Cir. 2023).  Iowa MMJ likely has a cause of action.

B.

Doe, Roe, and Iowa MMJ make a facial challenge to the Act.  Facial challenges are "hard to win."  ***Moody v. NetChoice, LLC***, 603 U.S. 707, 723 (2024); ***Reynolds***, 114 F.4th at 669.  To prevail, a plaintiff must establish either "no set of circumstances exists under which the law would be valid" or "the law lacks a plainly legitimate sweep."  ***NetChoice***, 603 U.S. at 723 (cleaned up).  To defeat the facial challenge, Bird must show only that the Act "is constitutional in some of its applications."  *See **United States v. Rahimi***, 602 U.S. 680, 693 (2024).  The question is whether all applications of the Act are preempted by federal law.

Conflict preemption is one way that Doe, Roe, and Iowa MMJ are likely to succeed on the merits.  Even if Congress does not expressly preempt state laws in statutory text, conflict preemption occurs either when "compliance with both federal and state regulations is a physical impossibility" or when a state regulation "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  ***Arizona v. United States***, 567 U.S. 387, 399 (2012); ***Geier v. American Honda Motor Co., Inc.***, 529 U.S. 861, 884 (2000).  State laws in conflict with federal law are "without effect."  ***Mutual Pharm. Co., Inc. v. Bartlett***, 570 U.S. 472, 479–80 (2013).  If every application of the Act conflicts with federal immigration law, then no application of the Act is constitutional.

-13-

True, "a court should not find pre-emption too readily in the absence of clear evidence of a conflict." *Geier*, 529 U.S. at 885. Rather, "the proper approach is to reconcile the 'operation of both statutory schemes with one another rather than holding one completely ousted.'" *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 127 (1973). Further, "courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona*, 567 U.S. at 400. Bird emphasizes that the presumption against preemption "has greatest force when Congress legislates in an area traditionally governed by the States' police powers." *CTS Corp. v. Waldburger*, 573 U.S. 1, 19 (2014).

But immigration is not a traditional subject of state regulation. To the contrary, the Supreme Court has "long recognized the preeminent role of the Federal Government with respect to the regulation of aliens within our borders." *Toll v. Moreno*, 458 U.S. 1, 10 (1982). The United States "has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394. Congress has the power to "establish a uniform Rule of Naturalization." **U.S. Const.** art. I, § 8. The United States has inherent power as sovereign to control and conduct relations with foreign nations. *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936). "Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation." *Arizona*, 567 U.S. at 395. *See Hines v. Davidowitz*, 312 U.S. 52, 64 (1941) ("One of the most important and delicate of all international relationships . . . has to do with the protection of the just rights of a country's own nationals when those nationals are in another country."). Decisions about the removal of illegal aliens "touch on foreign relations and must be made with one voice." *Arizona*, 567 U.S. at 409. For these reasons, the greatest presumption against preemption likely should not apply.

On the other hand, in the early days of the nation, states did enact laws to exclude from their borders certain aliens, including alien convicts and alien paupers. *Id.* at 419 (Scalia, J., concurring in part and dissenting in part). Bird argues that the Act is not a regulation of removal, but rather is an exercise of the inherent and

-14-

traditional state power to "exclude" persons. The Supreme Court has declined to "decide for or against the right of a State, in the absence of legislation by Congress, to protect herself by necessary and proper laws against paupers and convicted criminals from abroad." ***Chy Lung v. Freeman***, 92 U.S. 275, 280 (1876).

Even if Iowa possesses an inherent and traditional power to exclude, Iowa's Act still violates the Supremacy Clause if it clearly conflicts with federal law. *See* ***Gade v. National Solid Wastes Management Ass'n***, 505 U.S. 88, 108 (1992) (holding that "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield"). *See also* ***Mayor, Aldermen and Commonality of the City of New York v. Miln***, 36 U.S. 102, 143 (1837) (applying conflict preemption analysis even after concluding the state law in question was an exercise of the state's police powers). There is no absence of legislation from Congress here. "Federal governance of immigration and alien status is extensive and complex. Congress has specified categories of aliens who may not be admitted to the United States. . . . Unlawful entry and unlawful reentry into the country are federal offenses." ***Arizona***, 567 U.S. at 395. "Congress has specified which aliens may be removed from the United States and the procedures for doing so." ***Id.*** at 396.

Determining whether every application of Iowa's Act is likely conflict-preempted requires interpreting both the Act and federal law. *See* ***Crosby v. National Foreign Trade Council***, 530 U.S. 363, 373 (2000) ("What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects.").

Section 2 of the Act provides:

> A person who is an alien commits an offense if the person enters, attempts to enter, or is at any time found in this state under any of the following circumstances:
> a. The person has been denied admission to or has been excluded, deported, or removed from the United States.
> b. The person has departed from the United States while an order of exclusion, deportation, or removal is outstanding.

**Iowa Code § 718C.2(1)**. The penalty for violating the Act includes a fine of at least $855.00 and/or imprisonment not longer than two years. **§§ 718C.2(2)**, **903.1(2)**.

Similarly, federal law criminalizes illegal reentry, establishing fines and/or imprisonment not longer than two years for "any alien who has been denied admission, excluded, deported, or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter enters, attempts to enter, or is at any time found in, the United States." **8 U.S.C. § 1326(a)**. In effect, section 2 of the Act "adds a state-law penalty for conduct proscribed by federal law." *Arizona*, 567 U.S. at 400.

But unlike the federal crime of illegal reentry, section 2 has no exceptions. Under federal law, the U.S. Attorney General may expressly consent to an alien's reapplying for admission, or the alien may establish "that he was not required to obtain such advance consent." **8 U.S.C. § 1326(a)(2)**. Section 2 likely conflicts with federal law because it applies to aliens whom federal law, and federal officials acting under federal law, may exempt from the federal crime of illegal reentry.

As discussed, Bird argues that the Act should be interpreted not to conflict with federal law. She interprets section 2 of the Act to include all the federal law's exemptions, claiming this is the ordinary meaning of section 2 and required by Iowa's canons of construction. According to Bird, because section 2 criminalizes

only what is already a federal crime, the Act will not create any new implications for foreign relations. Further, Bird continues, federal immigration law defenses can be raised by aliens in state courts, and state courts will be able to rely on federal immigration decisions. Bird anticipates that state judges will not make decisions about an alien's admissibility or removability. Bird concludes that section 2 does not conflict with federal immigration law.

Again, Bird asks this court to ignore the plain meaning of the statute. *See Doe*, 903 N.W.2d at 351. The plain text of section 2 has no exceptions.

Even accepting Bird's interpretation, section 2 is still an obstacle to the exercise of the discretion that Congress gives federal officials charged with enforcing federal immigration law. *See Geo Group, Inc. v. Newsom*, 50 F.4th 745, 762 (9th Cir. 2022) (en banc) ("Such interference with the discretion that federal law delegates to federal officials goes to the heart of obstacle preemption."). Federal immigration law grants broad discretion to federal officials. *See, e.g.*, *Bouarfa v. Mayorkas*, 604 U.S. 6, 8 (2024) ("A common feature of our Nation's complex system of lawful immigration is mandatory statutory rules paired with discretionary exceptions."); *Patel v. Garland*, 596 U.S. 328, 332 (2022) (describing the discretion granted to the Attorney General, subsequently delegated to immigration judges, to grant or not grant eligible noncitizens relief from removal); *Newsom*, 50 F.4th at 751 (describing the "broad discretion" given to the Secretary of Homeland Security to choose the place to detain deportable aliens); *Trump v. Hawaii*, 585 U.S. 667, 683–84 (2018) (describing the "broad discretion" granted to the President to suspend the entry of aliens into the United States); *Arizona*, 567 U.S. at 396 (describing "broad discretion exercised by immigration officials" as a "principal feature of the removal system"); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424–25 (1999) (describing the statutory grant of authority to the Attorney General to determine whether the statutory conditions for withholding removal of an alien are met). Discretion in the enforcement of federal immigration law is vital for accomplishing the purposes of federal immigration law. It "embraces immediate human concerns." *Arizona*, 567 U.S. at 396. Due to "resource constraints and regularly changing public-safety and

-17-

public-welfare needs, the Executive Branch must balance many factors when devising arrest and prosecution policies." *United States v. Texas*, 599 U.S. 670, 680 (2023). Federal officials might choose to prioritize the arrest of an alien who commits a serious crime, rather than pursue enforcement against an alien who "has children born in the United States, long ties to the community, or a record of distinguished military service." *Arizona*, 567 U.S. at 396. "Some discretionary decisions involve policy choices that bear on this Nation's international relations." *Id.*

Even if section 2 were interpreted to have the same exceptions as federal law, the state law still conflicts with federal law because it creates a parallel scheme of enforcement for immigration law. Under section 2, Iowa could prosecute an illegal alien whom federal officials have exercised their discretion not to bring an enforcement action against. *Cf. id.* at 402 (expressing disapproval of a state having "the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies"). Also, creating a separate state offense eliminates the possibility of a presidential pardon. *Id.* at 403. Contrary to Bird's belief, section 2 does complicate U.S. foreign relations. "It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Id.* at 395. *See also Crosby*, 530 U.S. at 382 (describing how a state law that violated the Supremacy Clause undermined the President's "effective diplomacy"), *citing Chy Lung*, 92 U.S. at 279. Section 2 of the Act would "allow the State to achieve its own immigration policy," precisely the result the Supreme Court in *Arizona* found barred by conflict preemption. *Arizona*, 567 U.S. at 408.

Bird argues that the "mere 'fact of identity'" does "not mean the automatic invalidity of State measures." *Zyla Life Sciences, L.L.C. v. Wells Pharma of Houston, L.L.C.*, 134 F.4th 326, 332 (5th Cir. 2025), *quoting California v. Zook*, 336 U.S. 725, 731 (1949). Bird urges: "Our federal system would be turned upside

-18-

down if we were to hold that federal criminal law preempts state law whenever they overlap," quoting *Kansas v. Garcia*, 589 U.S. 191, 212 (2020). In the "vast majority of cases where federal and state laws overlap," this is likely true. *Id.* But not here. Immigration is not a traditional subject of state regulation. *Cf. Zyla*, 134 F.4th at 330 (recognizing that the challenged state law was part of the state's "traditional prerogative to police drug safety"). Immigration policy, unlike many other subjects of law, implicates "trade, investment, tourism, and diplomatic relations for the entire Nation." *Arizona*, 567 U.S. at 395. By allowing state officers to prosecute aliens who federal officials have not decided to arrest, section 2 of the Act likely conflicts with federal immigration law. Even under Bird's narrow reading, section 2 of the Act permits state officials to arrest illegal aliens for violating the state crime of illegal reentry. This authority "could be exercised without any input from the Federal Government about whether an arrest is warranted in a particular case." *Arizona*, 567 U.S. at 408. The result of section 2 "could be unnecessary harassment of some aliens . . . who federal officials determine should not be removed." *Id.*

Arresting an alien for illegal reentry, Bird argues, does not implicate foreign affairs any more than arresting an alien for another state crime, like being a felon-in-possession of a firearm. To the contrary, enforcing a generally applicable state crime like murder does not necessarily allow a state to "achieve its own immigration policy." *See id.* (finding that a generally applicable state law *did* conflict with federal immigration law because it empowered officers to arrest persons whom they had probable cause to believe committed removable offenses). *Cf. Kansas*, 589 U.S. at 210–12 (finding a generally applicable state law criminalizing identity-theft *not* conflict-preempted as applied to illegal aliens who wrote fraudulent social security numbers on their tax-withholding forms). Section 2 of the Act is not a generally applicable law. It applies only to aliens. **Iowa Code § 718C.2(1)**. Section 2 would allow Iowa to "achieve its own immigration policy," ignoring the discretionary decisions of federal officials. *Arizona*, 567 U.S. at 408. The effects of section 2 go beyond just upsetting "the criminal law enforcement priorities or preferences of federal officers." *Kansas*, 589 U.S. at 212. The Executive's enforcement discretion in immigration law "implicates not only 'normal domestic law enforcement

-19-

priorities' but also 'foreign policy objectives.'" **Texas**, 599 U.S. at 679. Section 2 of the Act empowers Iowa to contradict the policy decisions of Congress, and the policy decisions made with the discretion that Congress grants to federal immigration officials, frustrating U.S. law enforcement and foreign policy interests. Thus, section 2 of the Act likely conflicts with federal law. *See* **Arizona**, 567 U.S. at 395 ("The federal power to determine immigration policy is well settled.").

Federal immigration law authorizes the United States Attorney General to enter into agreements with a state to enable state officers to enforce federal law "in relation to the investigation, apprehension, or detention of aliens in the United States." **8 U.S.C. § 1357(g)(1)**. After this case began, the Iowa Department of Public Safety entered into an agreement with the United States. The agreement allows certified Iowa law enforcement officers to "enforce limited immigration authority with ICE oversight during their routine police duties." *Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act*, U.S. Immigr. & Customs Enf't, https://www.ice.gov/identify-and-arrest/287g (last accessed Aug. 15, 2025) [https://perma.cc/539Q-WQEW]. The agreement authorizes certified officers to "arrest without a warrant . . . any alien in the United States, if the officer has reason to believe the alien to be arrested is in the United States in violation of law and is likely to escape before a warrant can be obtained." Bird highlights that the agreement provides that the Iowa Department of Public Safety "is expected to pursue to completion prosecution of any state or local charges that caused the alien to be taken into custody. ICE may assume custody of aliens who have been convicted of a state offense only after such aliens have concluded service of any sentence of incarceration." Bird argues that when state officers enforce Iowa's Act at the same time as they enforce federal immigration law under the agreement, their enforcement of the Act cannot conflict with federal immigration law. Bird concludes that the facial challenge to Iowa's Act must fail because at least some applications of the Act will no longer conflict with federal law.

To the contrary, although some Iowa law enforcement officers may enforce federal law in certain circumstances, enforcing the *state* law still conflicts with

-20-

federal immigration law. A certified "officer or employee of a State or political subdivision of a State shall be subject to the direction and supervision of the [U.S.] Attorney General." **8 U.S.C. § 1357(g)(3)**; *see also **Arizona***, 567 U.S. at 409. Federal control pervades the 1357(g) agreement. By the agreement, candidates nominated by the Iowa Department of Public Safety must "be approved by ICE and must be able to qualify for appropriate federal security clearances," and must undergo "mandatory training" from ICE. *See also* **§ 1357(g)(2)** (requiring certified officers to "have knowledge of, and adhere to, Federal law relating to the function" and "have received adequate training regarding the enforcement of relevant Federal immigration laws"). The agreement specifies that approved officers "are not authorized to perform immigration officer functions except when working under the supervision or direction of ICE." And certified officers "operating in the field . . . shall contact an ICE supervisor at the time of exercising the authority" under the agreement, "or as soon as is practicable thereafter, for guidance." ICE may revoke a state law enforcement officer's approval "at any time and for any reason." By contrast, Iowa's Act has no direction and supervision by federal officials. A state officer enforcing the Act does so outside of the supervision and direction of federal officials, under state authority. The Act would allow Iowa to "achieve its own immigration policy," jeopardizing the "fundamental" principle "that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." ***Arizona***, 567 U.S. at 408, 395.

Bird also highlights that the United States has withdrawn its suit to enjoin enforcement of the Act. ***United States v. Iowa***, 2025 WL 1140834, at *1 (8th Cir. Apr. 15, 2025). Also, Bird cites the amicus curiae brief of the United States in a suit about a Florida law like Iowa's, arguing that the Florida law is not preempted. ***Florida Immigr. Coal. v. Attorney General***, No. 25-12441 (11th Cir. filed July 17, 2025). But the "Supremacy Clause gives priority to 'the Laws of the United States,'" not the criminal law enforcement priorities or preferences of federal officers." ***Kansas***, 589 U.S. at 212, *quoting* **U.S. Const.** art. VI, cl. 2. Congress gives discretion to federal officials in enforcing federal immigration law, with limited

-21-

opportunities for the involvement of states. *See, e.g.*, **8 U.S.C. § 1357**. Because the Act conflicts with the discretion that Congress gives to federal officials, the Act is preempted, even if federal officials support the Act.

D.

Section 4 of the Act provides:

> Upon a person's conviction of an offense under this chapter, the judge shall enter in the judgment in the case an order requiring the person to return to the foreign nation from which the person entered or attempted to enter. . . .
> . . . .
> An order issued under this subsection must include all of the following:
>     *a.* The manner of transportation of the person to a port of entry.
>     *b.* The law enforcement officer or state agency responsible for monitoring compliance with the order.

**Iowa Code § 718C.4(4), (5)**. Section 4 has no exceptions to the requirement that a judge issue this order.

By contrast, federal law provides federal officials discretion about the removal of aliens who reentered the United States. Federal law provides that if "the Attorney General finds an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal," then "the alien shall be removed under the prior order at any time after the reentry." **8 U.S.C. § 1231(a)(5)**. Because section 1231(a)(5) applies only to aliens who "illegally" reentered the United States, an exception to the crime of reentry is also an exception to removal under this provision. Even for aliens who illegally reenter the country, federal immigration officials may allow the withholding of removal for an illegal alien who "expresses a fear of returning to the country designated in [his reinstated order of removal]." *See* **8 C.F.R. § 241.8(e)**.

-22-

In *Arizona v. United States*, the Supreme Court found conflict-preempted a state law allowing officers to arrest persons whom they had probable cause to believe committed removable offenses. ***Arizona***, 567 U.S. at 407. Iowa's Act regulates removal more than the Arizona provision did. The Act creates a removable offense at the state-level. Further, section 4 of the Act creates state procedures for removing aliens who violate the state law. Thus, section 4 "violates the principle that the removal process is entrusted to the discretion of the Federal Government." ***Id.*** at 409. "A principal feature of the removal system is the broad discretion exercised by immigration officials." ***Id.*** at 396. Congress has created many exceptions to the removal of illegal aliens. *See, e.g.*, **8 U.S.C. § 1158(a)(1)** (allowing persons currently in the United States unlawfully to apply for asylum); **8 U.S.C. § 1254a(a)(1)(A)** (enabling the Attorney General to grant temporary protected status). *See also **Patel***, 596 U.S. at 332; ***Aguirre-Aguirre***, 526 U.S. at 424–25. Federal officials "as an initial matter, must decide whether it makes sense to pursue removal at all." ***Arizona***, 567 U.S. at 396. Because section 4 of the Act undermines the discretion of federal officials to decide who will be removed, it likely conflicts with federal immigration law.

Section 4 also likely conflicts with federal regulations over *where* to remove an alien to. Federal law restricts the removal of an illegal alien to a country "if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." **8 U.S.C. § 1231(b)(3)(A)**. Instead, federal law provides the Attorney General with a variety of other countries to which the illegal alien may be removed. **8 U.S.C. § 1231(b)(2)(A), (D), (E)**. This discretion is important for U.S. foreign relations. *See **Jama v. Immigration and Customs Enforcement***, 543 U.S. 335, 348 (2005) ("Removal decisions, including selection of a removed alien's destination, 'may implicate our relations with foreign powers' and require consideration of 'changing political and economic circumstances.'"). By contrast, section 4 of the Act mandates only one destination for an illegal alien—"the foreign nation from which the person entered or attempted to enter." **Iowa Code § 718C.4(4)**. Under section 4, an illegal alien may be ordered to return to a

country to which, under federal law, the Attorney General decided the alien must not be sent. Ordering an alien to return to one specific country thus contradicts federal officials' discretion.

Bird argues that the Act, properly interpreted, does not actually regulate the removal of illegal aliens from the United States. The Iowa Supreme Court presumes the state's statutes have no effect beyond the state's borders "unless the legislature clearly expresses otherwise." *Jahnke v. Deere & Co.*, 912 N.W.2d 136, 141 (Iowa 2018). Finding no clear expression in the text or legislative history of the Act, Bird argues section 4 does not regulate the removal of illegal aliens from the United States because it has no force beyond the borders of Iowa. Instead, Bird claims section 4 of the Act requires only the transportation of convicted aliens to a "port of entry" within Iowa, specifically the Des Moines International Airport. **Iowa Code § 718C.1(2)**; **19 C.F.R. § 101.3(b)(1)**.[2] Bird emphasizes that federal officials retain discretion at Des Moines International Airport to decide whether to remove an alien from the United States.

Once again, Bird asks this court to ignore the plain meaning of the statute. *See Doe*, 903 N.W.2d at 351. Section 4 requires a judge to issue an order to an alien, not to exit the state, but to "return to the foreign nation from which the person entered or attempted to enter." **Iowa Code § 718C.4(4)**. Then, section 5 of the Act does not criminalize failing to leave Iowa, but rather failing to "comply with the order." **§ 718C.5(1)(c)**. Section 5 reiterates that the order is "to return to the foreign nation from which the person entered or attempted to enter." **§ 718C.5(1)(b)**.

Further, the Supreme Court looks also to the effects of a state law when deciding whether it conflicts with federal law. *See Perez v. Campbell*, 402 U.S. 637,

---

[2]The Code of Federal Regulations lists two ports of entry in Iowa. But the district court noted that the Quad Cities International Airport is in Moline, Illinois, outside the territory of Iowa. *Iowa*, 737 F.Supp.3d at 734 n.2. Bird maintains that the only port of entry state officers may transport illegal aliens to under section 4 is the Des Moines International Airport.

-24-

651–52 (1971).  The effect of section 4, even as Bird interprets it on appeal, is to deliver aliens to the Des Moines International Airport with an order to leave the United States for the country from which they entered or attempted to enter, or face further criminal penalties for refusing to obey.  The effect of the Act is for illegal aliens not just to leave Iowa but to remove themselves from the United States entirely.  Section 4 thus "violates the principle that the removal process is entrusted to the discretion of the Federal Government."  *Arizona*, 567 U.S. at 409.

Even if section 4 of the Act were interpreted to leave the decision on removal to federal officials, Section 4 would still obstruct their discretion.  Delivering an illegal alien to federal officials at a port of entry forces officials to decide what to do with that alien, a decision they may have postponed.  Under the 1357(g) agreement between Iowa and ICE, certified officers who arrest an alien under the parameters of the agreement must "take the alien without unnecessary delay for examination before an immigration officer having authority to examine aliens as to their right to enter or remain in the United States."  But the agreement does not save section 4 of the Act from conflict preemption.  Certified state officers act under the supervision of federal officers.  A certified officer enforcing federal immigration law does not conflict with the discretion Congress gives to federal officials, because Congress permits federal officials to choose to allow state officers "to perform a function of an immigration officer."  **8 U.S.C. § 1357(g)(1)**.  But Iowa's Act would be enforced by Iowa officers without the supervision and direction provided for in the agreement, under the authority of state law.  Section 4 of the Act interferes with the discretion that federal immigration law commits to federal officials in removal decisions, so it is likely conflict-preempted.

E.

Section 6 of the Act obstructs the discretion of federal officials: "A court may not abate the prosecution of an offense under this chapter on the basis that a federal determination regarding the immigration status of the person is pending or will be initiated."  **Iowa Code § 718C.6**.  Even if federal officials are considering an alien's

Appellate Case: 24-2263     Page: 25     Date Filed: 10/23/2025 Entry ID: 5570706

case, Iowa may arrest the alien, prosecute the alien, obtain an order to return, and transport the alien to a port of entry. By prohibiting abatement of the state prosecution, section 6 undermines the discretion Congress gives federal officials to decide if, when, and how to address the case of an individual alien.

As discussed, Bird applies the *expressio unius est exclusio alterius* canon of statutory interpretation. ***Kucera***, 745 N.W.2d at 487 (describing that "the express mention of one thing implies the exclusion of others not so mentioned"). Bird interprets section 6 to *require* abatement after federal officials make a final determination of an alien's status. But, again, this reading contradicts the plain meaning of the statute. *See **Doe***, 903 N.W.2d at 351. The Act's text contains no mandatory abatement provision.

Distinguishing "abatement" from a voluntary stay of proceedings, Bird also argues that a state court might voluntarily stay a state prosecution on the basis that a federal determination is pending or yet-to-be initiated. But the potential for discretionary stays by state judges does not prevent conflict preemption. The decision to stay proceedings remains within the discretion of state courts, so Iowa still could make its own immigration policy. Under the current scheme of federal immigration law, the United States need not depend on the *noblesse oblige* of the states. *Cf. **United States v. Stevens***, 559 U.S. 460, 480 (2010). Federal immigration law bars states from making their own immigration policies. ***Arizona***, 567 U.S. at 408. Despite the potential for discretionary stays by judges (or discretionary non-enforcement by state prosecutors), the Act likely conflicts with federal immigration law.

## F.

Bird asks this court not to conclude here that the Act is likely facially unconstitutional, asserting "a basic uncertainty about what the law means and how it will be enforced." ***Arizona***, 567 U.S. at 415. Bird argues that reversing the preliminary injunction would give "state courts . . . an opportunity to construe" the

-26-

Act.  *Id.* at 416.  But this court has evaluated the Act according to Bird's interpretation.  This court does not "go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."  ***Keller v. City of Fremont***, 719 F.3d 931, 945 (8th Cir. 2013), *quoting* ***Washington State Grange v. Washington State Rep. Party***, 552 U.S. 442, 449–50 (2008).  This court does not "anticipate a question of constitutional law in advance of the necessity of deciding it"; nor does this court "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied."  ***Brockett v. Spokane Arcades, Inc.***, 472 U.S. 491, 501 (1985).  Any enforcement of the Act would likely conflict with federal law by interfering with the enforcement discretion that federal law gives to federal officers.  Doe, Roe, and Iowa MMJ have clearly shown that their facial challenge is likely to succeed on the merits because every application of the Act stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.  *See* ***Florida Immigr. Coal. v. Attorney General***, 2025 WL 1625385, at *3 (11th Cir. June 6, 2025) (declining to stay a preliminary injunction issued by a district court against the enforcement of a similar Florida law that the district court concluded is field-preempted), *app. for stay denied*, ___ S. Ct. ___, 2025 WL 1890573 (July 9, 2025) (Mem.).

V.

This court next examines the other *Dataphase* factors.  One factor is "the threat of irreparable harm to the movant."  ***Dataphase***, 640 F.2d at 113.  An irreparable harm occurs when "a party has no adequate remedy at law."  ***Sleep No. Corp.***, 33 F.4th at 1018.  A party "must show harm that is certain and great and of such imminence that there is a clear and present need for equitable relief."  ***Cigna Corp. v. Bricker***, 103 F.4th 1336, 1346 (8th Cir. 2024).  A party "is not required to prove with certainty the threat of irreparable harm, but it must prove that 'irreparable harm is likely in the absence of an injunction.'"  ***Sleep No. Corp.***, 33 F.4th at 1018, *quoting* ***Winter v. Natural Res. Def. Council, Inc.***, 555 U.S. 7, 22 (2008).  The district court found several potential harms from the enforcement of the Act:

-27-

- "permanent legal residents facing a risk of prosecution and criminal punishment under state law despite having permission under federal law to be present in the United States";
- "state court prosecutions for illegal reentry moving forward even when defendants are in the process of applying for legal status under federal law";
- "state court judges entering orders requiring noncitizens to leave the United States following an adjudicatory process with fewer safeguards and far less sophistication than the federal system";
- "state court judges requiring noncitizens to return to countries where they might not be accepted or might face prosecution or torture"; and
- "noncitizens being delivered to a port of entry with no clear mechanism for what happens next."

*Iowa*, 737 F.Supp.3d at 750.

This court reviews for clear error the district court's determination that "there is a threat of irreparable harm that justifies a preliminary injunction." *Sleep No. Corp.*, 33 F.4th at 1018. This court's scope of review is "very limited." *Id.* The district court did not clearly err in concluding that Doe, Roe, and other Iowa MMJ members showed harms that are certain, great, and imminent. Bird once again claims that the Act does not apply to Doe and Roe. But, as discussed, the most likely reading of the Act is that it applies to Doe and Roe, as well as other Iowa MMJ members. Also, Bird again argues that Iowa MMJ's mission does not cover aliens here illegally. But, as discussed, Bird defines Iowa MMJ's purpose too narrowly. *See also* ***Sierra Club v. U.S. Army Corps of Engineers***, 645 F.3d 978, 995–96 (8th Cir. 2011) (affirming a preliminary injunction when organizations with associational standing showed that individual members would suffer irreparable harms from the government's action). Bird seeks to enforce the Act, so the harms to Doe, Roe, and other Iowa MMJ members are "more than mere speculation." ***H&R Block, Inc. v. Block, Inc.***, 58 F.4th 939, 951 (8th Cir. 2023).

-28-

According to Bird, any harm is not irreparable. She elaborates that persons can raise as-applied challenges to the Act in response to prosecution. Thus, Bird concludes, a preliminary injunction of enforcement is improper. *See **Planned Parenthood Minn., N.D., S.D. v. Rounds***, 530 F.3d 724, 732 n.5 (8th Cir. 2008) (en banc) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."), *quoting **Beacon Theatres, Inc. v. Westover***, 359 U.S. 500, 506–07 (1959). True, the "mere prospect of facing criminal prosecution is not per se irreparable injury." ***Munson v. Gilliam***, 543 F.2d 48, 54 (8th Cir. 1976); *see also **Lindell v. United States***, 82 F.4th 614, 620 (8th Cir. 2023). But, here, there are additional harms which are irreparable. *Cf. **United States v. South Carolina***, 720 F.3d 518, 533 (4th Cir. 2013) (concluding that "for individual, unlawfully present immigrants and others, the likelihood of chaos resulting from" a state "enforcing its separate immigration regime is apparent"). For example, Iowa MMJ member Anna might be prevented from pursuing her chosen career. ***Terrance v. Thompson***, 263 U.S. 197, 215 (1923) (holding that the Constitution protected the right of an alien "to earn a livelihood by following the ordinary occupations of life," and finding that the alien suffered an irreparable harm when the "threatened enforcement of the law" prevented him from pursuing his desired occupation). The district court did not clearly err in determining that a threat of irreparable harm exists. *See **Georgia Latino All. for Hum. Rts. v. Governor of Georgia***, 691 F.3d 1250, 1269 (11th Cir. 2012) (holding that "enforcement of a state law at odds with the federal immigration scheme is neither benign nor equitable").

For the final two *Dataphase* factors, the district court concluded that the balance of the harms and the public interest favored granting the preliminary injunction. When a state official acting in her official capacity is the nonmoving party, the public interest and the balance of the harms merge into one factor. ***Eggers v. Evnen***, 48 F.4th 561, 564–65 (8th Cir. 2022). Bird emphasizes the harm to the state from preventing enforcement of an enacted law. ***Abbot v. Perez***, 585 U.S. 579, 602 n.17 (2018); ***Org. for Black Struggle v. Ashcroft***, 978 F.3d 603, 609 (8th Cir. 2020). Bird also stresses that if Iowa cannot enforce the law, it will suffer harms from the presence of tens of thousands of illegal aliens within its borders. Bird

argues that the harm is even worse because, according to her, the Act involves Iowa's core sovereign right to use its police power to control who may enter and remain in its territory. Nevertheless, the district court concluded that the *Dataphase* factors favored granting the preliminary injunction. *Iowa*, 737 F.Supp.3d at 750. This court reviews for abuse of discretion the district court's balancing of the harms and weighing of the public interest. *See, e.g.*, **Cigna Corp.**, 103 F.4th at 1348–49.

Under the 1357(g) agreement, certified state officers can enforce federal immigration law. This ameliorates Bird's concern about an illegal immigration crisis. *See **Florida Immigr. Coal.**, 2025 WL 1625385, at \*6. Bird even argues that the preliminary injunction might impede Iowa's ability to fulfill its obligations under the agreement. But the preliminary injunction enjoins the enforcement of Iowa's Act, not federal immigration law. On the other hand, Doe, Roe, and the other Iowa MMJ members face many harms from the enforcement of the Act, as found by the district court. Also, the Act could harm the public interest by causing friction with foreign countries and weakening the effective diplomacy of the Executive Branch. *See **Arizona**, 567 U.S. at 395; **Hines**, 312 U.S. at 63 (explaining that "the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *See also **Florida Immigr. Coal.**, 2025 WL 1625385, at \*5 (holding that because the state attorney general's success on the merits is "quite uncertain," the harm of not being able to enforce the state law "is less relevant"). The district court did not abuse its discretion in finding the balance of the equities favored enjoining the enforcement of the Act.

The district court did not abuse its discretion in granting the preliminary injunction.

## VI.

Two questions remain. First, who does the preliminary injunction enjoin from enforcing the Act? The district court issued one order for two cases—this suit and

-30-

a separate suit by the United States. Unlike the plaintiffs, the United States also sued the State of Iowa, Iowa Governor Kimberly Reynolds, and the Iowa Department of Public Safety and Commissioner Stephan Kenneth Bayens. The district court granted a preliminary injunction, ordering: "Defendants are hereby ENJOINED from enforcing Senate File 2340 pending further proceedings." *Iowa*, 737 F.Supp.3d. at 751. The United States dismissed its suit. *Iowa*, 2025 WL 1140834, at *1. Bird requests that the injunction apply only against the named defendants in this suit—herself, Graham, and Herrmann. *See Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015) ("A district court has no authority to enjoin the statute; an injunction would run only against the defendants in this case."). Doe, Roe, and Iowa MMJ seek to preserve the statewide injunction against the Act. They cite Federal Rule of Civil Procedure 65, authorizing district courts to enjoin "the parties," "the parties' officers, agents, servants, employees, and attorneys," as well as "other persons who are in active concert or participation" with the parties. **Fed. R. Civ. P.** 65(d)(2). *See Florida Immigr. Coal.*, 2025 WL 1625385, at *4 (recognizing that "the precise interpretation of Rule 65(d)(2)'s boundaries is tricky").

Second, to whom does the preliminary injunction provide relief? "Traditionally, courts issued injunctions prohibiting executive officials from enforcing a challenged law or policy only against the plaintiffs in the lawsuit." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2548 (2025). Thus "universal injunctions"— that is, injunctions that "prohibit enforcement of a law or policy against *anyone*"— "likely exceed the equitable authority that Congress has granted to the federal courts." *Id.* Doe, Roe, and Iowa MMJ argue that narrowing the relief to enjoin enforcement of the Act only against them is not workable. Bird responds that the Supreme Court held that "the policy pros and cons are beside the point." *Id.* at 2560. Doe, Roe, and Iowa MMJ also argue that a statewide injunction is especially important in a preemption case, because a narrower injunction allows a state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399. Bird counters that there is no preemption exception to the rule against universal injunctions. Bird concludes that

-31-

extending the injunction to persons beyond the Iowa MMJ members would make the injunction "broader than necessary to provide complete relief to each plaintiff with standing to sue." ***Trump***, 145 S. Ct. at 2562–63.

The district court did not address the scope of the injunction. Nor did the district court explain whether its injunction was a "universal injunction" or only relief to the plaintiffs. The district court also did not decide whether Iowa MMJ has standing to sue as an organization for injuries to itself. This court is "a court of review, 'not of first view.'" ***MPAY Inc. v. Erie Custom Comput. Apps., Inc.***, 970 F.3d 1010, 1021 (8th Cir. 2020). Doe, Roe, and Iowa MMJ invite this court to remand this case to the district court to evaluate these legal questions and perhaps receive additional factual submissions. Bird asks this court to apply *Trump v. CASA* here. In *Trump v. CASA*, the Supreme Court declined to decide "whether a narrower injunction is appropriate." ***Trump***, 145 S. Ct. at 2558. The Court left to the lower courts "to consider these and any related arguments." ***Id.*** The Court expects the lower courts to "move expeditiously to ensure that, with respect to each plaintiff," the injunctions are not "broader than necessary to provide complete relief to each plaintiff with standing to sue" and that the injunctions "otherwise comply with principles of equity." ***Id.*** at 2563–64. The district court "should determine whether a narrower injunction is appropriate." ***Trump***, 145 S. Ct. at 2558.

* * * * * * *

The order granting a preliminary injunction is affirmed, except as modified consistent with this opinion.

_____

-32-